PAUL E. THURLOW *vs.* TOWN OF PROVINCETOWN.

Suffolk. April 8, 1958. — May 2, 1958.

Present: WILKINS, C.J., RONAN, SPALDING, WHITTEMORE, & CUTTER, JJ.

*Negligence,* Water pipe, Independent contractor, Dangerous work. *Agency,* What constitutes, Independent contractor. *Municipal Corporations,* Liability for tort, Waterworks.

Evidence did not warrant a finding that one, not an employee of a town, hired by it "as an expert in thawing" was an agent of the town rather than an independent contractor in using an electrical machine to thaw a frozen service water pipe in a street. [453]

In an action against a town for damage by fire to a house alleged to have resulted from the use, by an independent contractor hired by the town "as an expert in thawing," of an electrical machine to thaw a frozen service water pipe leading to the plaintiff's house, the evidence did not warrant a finding of negligence contributing to the damage on the part of any employee of the town participating in the operation or of negligence in the selection of the expert. [453–454]

Evidence did not warrant a finding that work, done by an independent contractor hired by a town "as an expert in thawing" in a street where there was a frozen underground service water pipe running to a nearby house, of using an electrical machine to send current through the pipe to thaw it was of such a nature as to impose liability on the town for damage by fire to the house if it resulted from negligence of the expert. [454–455]

CONTRACT OR TORT. Writ in the Superior Court dated February 4, 1949.

The action was tried before *Leary,* J.

*John W. Burke,* (*Joseph J. Monaghan* with him,) for the plaintiff.

*James M. Langan,* for the defendant.

CUTTER, J. The plaintiff seeks to recover for damage by
fire to his house alleged to have been caused by the defend-
ant's negligence in permitting electricity to escape into the
house from the defendant's underground water system. The
case is before us on the plaintiff's exception to the trial
judge's direction of a verdict for the defendant. The facts
are stated in their aspect most favorable to the plaintiff.

On February 7, 1948, the plaintiff's house was not getting
water from the defendant's water supply system from which
the plaintiff bought water. The superintendent of the water
department and one Kacergis, a metal smith, went to the
street in front of the plaintiff's house to thaw the pipes
which were frozen. Kacergis took with him a portable weld-
ing machine capable of generating two hundred amperes and
forty volts of electricity. The place where the pipes in the
street were frozen was found to be on the street side of a
shut off valve in a one inch line running below the surface
of the ground to the plaintiff's house. The one inch line
obtained water from a six inch main which lay beneath the
center of the street. The valve was reached from above
through a vertical four inch cast iron pipe. There was a
comparable valve in the one inch pipe which led from the
six inch main to the house opposite that of the plaintiff.
Each valve could be opened or closed by an iron rod inserted
from above through the appropriate four inch pipe. Such
rods were attached to, and wedged down upon, each of these
valves. To these rods Kacergis attached electrodes with the
purpose of sending an electric current through the rods and
the intervening pipes to thaw the latter.

It was found impossible to obtain a good electrical con-
nection through this circuit. Nevertheless, in an attempt to
do so, the machine was operated for several minutes. Water
department employees "then went to the connection and
jiggled the rod, first on the connection on one side and then
on the connection on the other side." This failed to improve
the connection.

An excavation was then made to uncover the valve box
near the plaintiff's house and an electrode was attached di-

rectly to the pipe. A circuit was established immediately and the machine was run for a period of from twenty to forty-five minutes, at the end of which a fire was discovered in the plaintiff's house from which "a sudden surge of steam pressure came . . . to the . . . valve." The machine was then shut off.

Kacergis, who was requested to do this work by the superintendent, "billed . . . for each such job." Any "work concerning the attaching of electrodes and the operation of the machine was done by . . . Kacergis who was not an employee of the town, nor did he work under the direction of the town, but . . . he was in charge of the job and hired by the town as an expert in thawing and . . . was in charge of the thawing process . . . . [N]o employee of the town had anything to do with the attachment of any machine or electrodes. As far as electricity and his apparatus was concerned Kacergis was in complete control." Kacergis "does not come under the jurisdiction of the . . . superintendent," who "exercised direction on digging the hole and nothing else."

Prior to the time he was requested to do the work Kacergis directed the attention of representatives of the town to the fact "that the machine was inadequate . . . to do this kind of a job." He did not enter the plaintiff's house between arriving on the job and the outbreak of the fire. "The method of thawing as used here is always used and Kacergis was called in because the thawing process was beyond . . . [the] knowledge or capacity" of the superintendent.

The plaintiff's house had a steam heating system which "prior to the fire . . . was in perfect working order." The heater "was connected to the water supply with iron pipe . . . [and] run by electricity and . . . the wiring was BX with fourteen gauge wire." It was testified by Kacergis "that the effect of the intensity of heat of 200 amps. flowing through a fourteen gauge wire would be to burn it up." An expert electrician testified "that attaching the electrodes to rods that were wedged down on top of a . . . valve [essentially the method first attempted] was not a proper

way to make a connection; that in order for this system to function properly a tight connection is necessary at both electrodes; 'if any of those connections are faulty, the path could be up through this pipe . . . [and] the current could flow in any direction.'" The expert further testified (although this testimony was disputed) that it would be possible to energize the outer covering of the BX cable which "before it breaks down . . . will be cherry red over the metal covering everywhere in the house"; that the proper way to do the "thawing operation would be to isolate the house" by taking out the water meter or removing a coupling from the pipe.

1. A municipality is liable for its negligence in connection with maintaining a water supply system, in part for the use of inhabitants who pay for the water supplied. *Sloper* v. *Quincy*, 301 Mass. 20, 24. *Iver Johnson Sporting Goods Co.* v. *Boston*, 334 Mass. 401, 402.

2. Even if it be assumed that on the expert evidence it could have been found that Kacergis was negligent, there was no evidence which would warrant a finding that Kacergis was the agent or employee of the defendant. All the evidence tended to show that he was an independent contractor. Even if this evidence should not be believed, the burden would remain on the plaintiff to show that Kacergis was the town's agent. *Jordan* v. *C. I. T. Corp.* 302 Mass. 281, 283–284. See *Anglim* v. *Brockton*, 278 Mass. 90, 95. Accordingly, to hold the defendant liable it must be shown either (a) that the servants and employees of the town participating in the work were themselves negligent (see *Baumgardner* v. *Boston*, 304 Mass. 100, 105–107) or (b) that the defendant, upon some ground other than that Kacergis was its agent, was liable because of negligent acts of Kacergis, an independent contractor.

3. There was no evidence from which it could be found that the superintendent or his employees did any work negligently. The evidence was that the superintendent "had nothing to do with establishing electrical contact with the pipe . . . that was Kacergis's job." Although it could

have been found that the superintendent "went along and put the rods in the box," there is no basis for a finding that it was not done with due care. The testimony that, as Kacergis told the superintendent, "the machine was inadequate . . . to do this kind of a job," even if it shows improper equipment was used, has no tendency to prove any causal relation between the inadequacy and the fire. See *Sturman* v. *Davis*, 321 Mass. 442, 443–444; Restatement: Torts, § 430; Harper and James, Torts, §§ 20.1, 20.2; Prosser, Torts (2d ed.) § 44. Compare *Comeau* v. *Beck*, 319 Mass. 17, 19–20. There is also no evidence that the defendant reserved to itself power to direct Kacergis's actions in respect of his electrical connections and other electrical work. See *Doyle* v. *LaCroix*, 336 Mass. 484, 487. Compare *Hartman's Case*, 336 Mass. 508, 510. There was no evidence that the superintendent was negligent in his selection of Kacergis as an expert or that Kacergis was not well qualified. For reasons discussed below, it could not have been found that the superintendent was lacking in due care in permitting Kacergis to do the work in the manner adopted by the latter.

4. It next must be considered whether the work done was of an especially dangerous character, where "necessarily from the nature and circumstances of the work harm will occur unless guarded against," so that even if there had been "selection of a capable . . . person to do the" work, the defendant would be liable "if, through any lack of reasonable care on . . . [its] own part in guarding against the known dangers of the undertaking, injury result[ed] . . . from the negligence of those to whom . . . [it] entrust[ed] . . . its performance." *McConnon* v. *Charles H. Hodgate Co.* 282 Mass. 584, 588. *Whalen* v. *Shivek*, 326 Mass. 142, 149–152. See Restatement: Torts, § 835 (d) and (e) and comment h. Compare absence of liability of an owner or other responsible person for "negligence of . . . [an] independent contractor which is merely incidental to carrying out nondangerous work." *Doyle* v. *LaCroix*, 336 Mass. 484, 488. See also *Todd* v. *Wernick*, 334 Mass. 624,

626–627.   Compare Restatement: Torts, §§ 409, 413–414, 416, 423.

In counts 1 and 2 the plaintiff did not allege that the method of thawing employed was of an ultra hazardous or unusual nature.   However, we need not consider whether upon the present pleadings there could be recovery in tort under the principles of law just mentioned.   We think it could not be found that those concerned had ground to believe that injury would probably result from this work unless the defendant took special precautions.   There was no evidence of any fire or injuries arising out of use of the thawing method either in Provincetown or elsewhere.   The method had been used by Kacergis and the superintendent on other occasions and was "always used."   The operation, using as it does electricity in an underground pipe, does not have the same obvious inherent risk of injury as a blasting explosion such as was considered in the *McConnon* case, 282 Mass. 584, and in *Coughlan* v. *Grande & Son, Inc.* 332 Mass. 464, 466, or the use of toxic fumigants dealt with in *Ferguson* v. *Ashkenazy,* 307 Mass. 197, 201.   See analysis of other relevant cases in *Whalen* v. *Shivek,* 326 Mass. 142, 150–151;  Prosser, Torts (2d ed.) § 64, pages 357–361, where it is said that "the principle [of responsibility for negligence of an independent contractor doing inherently dangerous work] seems to be limited to work in which there is a high degree of risk in relation to the particular surroundings, or some rather specific danger to those in the vicinity, *recognizable in advance* as calling for definite precautions" (emphasis supplied).   See Harper and James, Torts, § 26.11.

5. Upon the evidence here present, there is no basis for holding the defendant liable for any negligence on the part of Kacergis.

*Exceptions overruled.*